# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WYETH,** | 03-CV-1293 (WJM) |
| **Plaintiff,** | |
| **v.** | **MARKMAN OPINION** |
| **TEVA PHARMACEUTICALS USA, INC.  and TEVA PHARMACEUTICAL INDUSTRIES LTD.,** | |
| **Defendants.** | |

This matter comes before the Court on the parties' submissions seeking construction of four disputed claim terms found in the patents-in-suit.  Having taken into consideration the parties' submissions and their arguments made during the *Markman* hearing, the Court construes the disputed claim terms as follows.

## BACKGROUND

This is an Abbreviated New Drug Application ("ANDA") patent infringement action. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. ("Teva") filed an ANDA seeking to market a generic version of Wyeth's Effexor® XR.  Wyeth filed suit, alleging Teva's generic extended release venlafaxine formulation infringes three of its patents:  U.S. Patent Nos. 6,274,171 B1 (the "'171 patent"), 6,419,958 B2 (the "'958 patent"), and 6,403,120 B1 (the "'120 patent").  The three patents are related and share an essentially identical specification.

Wyeth charges Teva with infringement of claims 20-25 of the '171 patent, claims 1-6 of the '958 patent, and claims 1, 2, 13 and 14 of the '120 patent.  These claims are all method claims and are directed towards a method of administering an extended release formulation of venlafaxine hydrochloride that provides a therapeutic blood plasma concentration of venlafaxine over twenty-four hours.  The specification states that the extended release formulation provides two advantages over the immediate release formulation.  First, it eliminates the sharp peaks and troughs in blood plasma drug levels caused by multiple daily dosing with conventional immediate release venlafaxine hydrochloride tablets.  '171 patent, col. 2, lines 24-28.[1]  Thus, rather than take two to three doses a day, patients need only take the extended release formulation once a day.  Second, it reduces the side effects experienced by patients who have taken the immediate release tablets.  *See id.* at col. 2, lines 46-55.  The extended release formulation was found to reduce the incidence of nausea and emesis (the act of vomiting).  According to Wyeth, these two advantages provided improved patient compliance and tolerability, making Effexor® XR a blockbuster drug.  (*See* Wyeth's Br. at 2).

Although the named inventors attempted to develop an extended release formulation in the form of a tablet, they failed, finding it "impossible" to achieve a sustained release tablet formulation.  Col. 10, lines 53-57.  They did, however, succeed in developing a film-coated spheroid formulation that could be administered in a capsule.  The specific formulation they found worked was composed of "venlafaxine hydrochloride, microcrystalline cellulose and,

---

[1]Because the patents-in-suit share an essentially identical specification, all future citations will be to the '171 patent unless otherwise noted.

optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and

hydroxypropylmethylcellulose."  Col. 2, line 67 - col. 3, line 2.

Prior to submitting their *Markman* briefs, the Court required the parties to submit a Joint

Claim Construction Chart ("Chart") setting forth the claim terms in dispute and the parties'

respective proposed constructions for each term.  The parties identified four disputed claim

terms:  "extended release formulations," "spheroid," "with diminished incidence(s) of nausea and

emesis," and "encapsulated."  (*See* Chart).  For claim construction purposes, the following claims

are illustrative of how these terms are used.  Claims 20 and 21 of the '171 patent recite:

> 20.    A method for providing a therapeutic blood plasma concentration of venlafaxine
> over a twenty four hour period <u>with diminished incidences of nausea and emesis</u>
> which comprises administering orally to a patient in need thereof, an
> <u>encapsulated</u>, <u>extended release formulation</u> that provides a peak blood plasma
> level of venlafaxine in from about four to about eight hours, said formulation
> containing venlafaxine hydrochloride as the active ingredient.

> 21.    A method for eliminating the troughs and peaks of drug concentration in a
> patients [sic] blood plasma attending the therapeutic metabolism of plural daily
> doses of venlafaxine hydrochloride which comprises administering orally to a
> patient in need thereof, an <u>encapsulated</u>, <u>extended release formulation</u> that
> provides a peak blood plasma level of venlafaxine in from about four to about
> eight hours, said formulation containing venlafaxine hydrochloride as the active
> ingredient.

Claims 1 and 14 of the '120 patent recite:

> 1.     A method for providing therapeutic blood plasma concentration of venlafaxine
> over a twenty four hour period <u>with diminished incidence of nausea and emesis</u>
> which comprises administering orally to a patient in need thereof, an <u>extended
> release formulation</u> that provides peak blood plasma levels of venlafaxine of no
> more than about 150 ng/ml, said formulation containing venlafaxine
> hydrochloride as the active ingredient.

> 13.    The method of claim 1 wherein the <u>extended release formulation</u> comprises
> venlafaxine hydrochloride in an <u>encapsulated</u> <u>spheroid</u>.

3

**DISCUSSION**

**I.     Law of Claim Construction**

The Federal Circuit en banc recently reaffirmed the claim construction methodology articulated by *Markman v. Westview Instruments, Inc.*[2] and its progeny and clarified the role that dictionaries play in claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). In *Phillips*, the Federal Circuit reestablished the primacy of the intrinsic evidence – the claims, specification and prosecution history – and reclassified dictionaries as part of the less significant extrinsic evidence. In doing so, the Federal Circuit emphasized the need to construe the claims in their proper context, which is the specification. *Id.* at 1321.

The objective of claim construction is to determine how a person of ordinary skill in the art would understand the claim terms. *Id.* at 1313, 1324. Generally, claim terms are given their ordinary and customary meaning. *Id.* at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). That meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. In determining the ordinary meaning of claim terms, the person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the particular claims in which they appear and the specification. *Id.* at 1313.

The claims "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Oftentimes, the context in which a term is used in asserted and unasserted claims

---

[2]52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

4

"can be highly instructive." *Id.* Further, differences among claims can provide useful insight into a term's meaning. *Id.*

But the claims cannot be looked at in isolation; rather, they must be considered in view of the specification. *Id.* at 1315. The specification is considered to be the "single best guide" for construing the claims. *Id.* The specification may reveal whether the patentee acted as his own lexicographer by giving a claim term a special definition. *Id.* Or, it may show that the patentee intentionally disclaimed claim scope. *Id.* In either case, the patentee's intent is dispositive. *Id.*

A court should also consider the prosecution history, if it is in evidence. *Id.* at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ("PTO")] and includes the prior art cited during the examination of the patent." *Id.* (citing *Autogiro Co. of Am. v. United States*, 181 Ct. Cl. 55, 384 F.2d 391, 399 (1967)). Although it "often lacks the clarity of the specification and thus is less useful for claim construction purposes," the prosecution history sheds light on the PTO's and inventor's understanding of the patent. *Id.*

A court may, in its discretion, consult extrinsic evidence, i.e., dictionaries, treatises, and expert and inventor testimony, when construing claim terms. *Id.* A court may consult extrinsic evidence to educate itself about the field of the invention and to aid its understanding of what one of ordinary skill in the art would understand a claim term to mean. *Id.* at 1319. But extrinsic evidence is "less significant" and "less reliable" than intrinsic evidence because it gives meaning to a claim term in the abstract, rather than in the particular context of the patent. *Id.* at 1317-18. Thus, although it may play a supporting role in claim construction, extrinsic evidence may not be used to contradict an unambiguous meaning established by the intrinsic record. *See id.* at 1324.

II.     **The Disputed Claim Terms**

1.      **"extended release formulation"**

Wyeth contends that "extended release formulation" should be given its ordinary meaning and construed as "[a] formulation which releases the active ingredient at a slower rate than the immediate release formulation of the active ingredient such that the dosing frequency is once-a-day rather than the plural daily dosing for the immediate release formulation." (Chart). Teva asserts that the patentees acted as their own lexicographers by identifying certain ingredients that must be present in the formulation. Teva asserts that "extended release formulation" means "[a] formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration." (*Id.*, emphasis added). Because the Court agrees with Teva that the patentees acted as their own lexicographers, the Court will adopt Teva's proposed claim construction.

The Court begins by looking at the context in which the term "extended release formulation" is used in the claims of the patents-in-suit. Wyeth argues that the asserted claims demonstrate that the patentees did not intend to limit "extended release formulation" to any specific set of ingredients. Every asserted claim recites: "A method . . . which comprises administering orally to a patient in need thereof, an . . . extended release formulation . . ., said formulation containing venlafaxine hydrochloride as the active ingredient." (*See, e.g.*, '171 patent, claim 20, emphasis added). Wyeth argues that if in fact "extended release formulation"

encompassed particular ingredients, including venlafaxine hydrochloride, then the limitation "said formulation containing venlafaxine hydrochloride as the active ingredient" would be superfluous.  (Wyeth's Br. at 11).  According to Wyeth, if "extended release formulation" already included venlafaxine hydrochloride, then there is no need for the claims to specify the active ingredient.  Thus, argues Wyeth, "extended release formulation" does not include any particular ingredients.

Wyeth also contends that the doctrine of claim differentiation supports its broad construction of "extended release formulation."  The doctrine of claim differentiation gives rise to a presumption that a limitation added in a dependent claim is not present in the independent claim.  *Phillips*, 415 F.3d at 1314-15.  Comparing independent claim 1 of the '120 patent with dependent claim 3, Wyeth argues that the doctrine creates a presumption that "extended release formulation" does not include specific ingredients.  (Wyeth's Br. at 13).  Independent claim 1 recites: "A method . . . which comprises administering orally to a patient in need thereof, an extended release formulation . . ., said formulation containing venlafaxine hydrochloride as the active ingredient."  '120 patent, claim 1 (emphasis added).  Dependent claim 3 recites: "The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and optionally, hydroxypropylmethylcellulose."  '120 patent, claim 3 (emphasis added).  Because claim 3 includes the additional limitation of specific ingredients, the Court agrees with Wyeth that a presumption arises that claim 1 does not include that limitation.  Thus, the Court agrees with Wyeth that the plain language of the claims implies that "extended release formulation" does not include specific ingredients.

Teva does not dispute that the claims, on their face, imply a broad construction for "extended release formulation."  Rather, Teva argues that the presumption the broader construction applies is overcome by the narrow definition given to "extended release formulation" by the patentees in the specification.  This Court agrees.

The patentees defined "extended release formulation" several times in the specification.  In the abstract, they disclosed:

> More particularly, the <u>invention comprises an extended release formulation of</u> venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlfaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

'171 patent, Abstract.  They reiterated this same restrictive definition in the "Brief Description of the Invention:"

> The <u>formulations of this invention comprise</u> an extended release formulation of venlafaxine hydrochloride comprising a therapeutically effective amount of venlafaxine hydrochloride in spheroids comprised of venlafaxine hydrochloride, microcrystalline cellulose and, optionally, hydroxypropylmethylcellulose coated with a mixture of ethyl cellulose and hydroxypropylmethylcellulose.

'171 patent, col. 2, line 62 - col. 3, line 2.  Only after setting forth this description of their invention, did the inventors then go on to address the preferred embodiments of their invention.  *See* '171 patent, col. 3, lines 5-62.  Similarly, in the "Detailed Description of the Invention," the patentees defined "extended release formulations" by their ingredients:

> The <u>extended release formulations of this invention are comprised of</u> [venlafaxine] hydrochloride in admixture with microcrystalline cellulose and hydroxypropylmethylcellulose.  Formed as beads or

8

> spheroids, the drug containing formulation is coated with a mixture
> of ethyl cellulose and hydroxypropylmethyl cellulose [sic] to
> provide the desired level of coating . . . .

'171 patent, col. 4, lines 9-15 (emphasis added).

Wyeth asserts that these statements merely identify a preferred embodiment of the invention. The Court disagrees. Because the specification definitively states that the "extended release formulations" of the invention are limited to particular ingredients, the Court finds that the patentees acted as their own lexicographers and limited the meaning of "extended release formulation." *See Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004) (finding that the inventors acted as their own lexicographers and limited the term "solubilizer" to surfactants by stating in the specification that "[t]he solubilizers suitable according to the invention are defined below", and later describing the suitable solubilizers as surfactants).

Moreover, the specification provides additional support for a narrow construction of "extended release formulation." Although it is improper to limit the claims based on the preferred embodiments, the Federal Circuit has stated that the "preferred embodiments can shed light on the intended scope of the claims." *Id.* at 1340. Here, the specification sets forth seven examples describing different embodiments the named inventors worked with. Each and every embodiment of an "extended release formulation" recited in these examples includes venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC[3] coated with ethyl cellulose and HPMC. *See, e.g.*, '171 patent, col. 5, line 33 - col. 10, line 57. The fact that all of these examples use the same core set of ingredients buttresses the conclusion that "extended release

---

[3]"HPMC" is the abbreviation for "hydroxypropylmethylcellulose."

9

formulation" should be narrowly construed.  *See Astrazeneca*, 384 F.3d at 1340-41 (finding

additional support for a limited construction of "solubilizer" in the fact that "all of the

solubilizers listed in the specification and used in the working examples were surfactants").

Further, the specification distinguishes the "extended release formulations" of the

invention from extended release hydrogel tablet formulations.  Wyeth admits that under its

proposed construction, an extended release hydrogel tablet having the claimed *in vivo*

characteristics may fall within the asserted claims.  (*See* Wyeth's Br. at 16 n.6).  The

specification, however, discloses that the inventors' attempts to develop extended release

hydrogel tablets were "fruitless" and teaches one of ordinary skill that it is "impossible to

achieve" the desired dissolution rates using hydrogel tablet technology.  Col. 4, lines 60-64; col.

10, lines 53-57.  These statements were made without qualification.  Accordingly, the

specification supports construing "extended release formulation" more narrowly than Wyeth

proposes.  *See Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000)

("Claims are not correctly construed to cover what was expressly disclaimed.").

Wyeth responds that the specification supports its broader, ordinary meaning of the term.

Wyeth asserts that Teva ignores several portions of the specification which allegedly refer only to

the "extended release formulation" as including venlafaxine hydrochloride.  *See, e.g.*, '171

patent, Abstract ("This invention relates to a 24 hour <u>extended release dosage formulation</u> and

unit dosage form thereof of <u>venlafaxine hydrochloride</u>, an antidepressant . . . .") (emphasis

added); *Id.* at col. 2, lines 14-16 ("In accordance with this invention, there is provided an

<u>extended release (ER), encapsulated formulation</u> containing <u>venlafaxine hydrochloride</u> as the

active drug s [sic] component . . . .") (emphasis added); *Id.* at col. 2, lines 37-44 ("Hence, in

accordance with the use aspect of this invention, there is provided a method for moderating the

plural blood plasma peaks and valleys . . . which comprises administering to a patient in need of

treatment with venlafaxine hydrochloride, a one-a-day, <u>extended release formulation of</u>

<u>venlafaxine hydrochloride</u>.") (emphasis added).  Wyeth further asserts that its broad construction

is supported by those portions of the specification that compare "extended release formulations"

with immediate release formulations.  *See, e.g.*, '171 patent, col. 2, lines 24-37 (contrasting blood

plasma profiles for both types of formulations without reference to specific ingredients).  And

Wyeth contends that Table 1 in the specification supports a broader construction because it

allegedly teaches an ordinary artisan how to screen for other useful inactive ingredients that may

work in combination with venlafaxine hydrochloride to develop an extended release venlafaxine

formulation.  But there is no merit to Wyeth's arguments because they ignore those portions of

the specification set forth above that explicitly characterize and limit the invention to a

formulation containing specific ingredients.

 When the term "extended release formulation" is looked at in its proper context in the

specification, this Court believes that one of ordinary skill in the art would construe the term to

include specific ingredients.  The unequivocal language the patentees used when describing their

invention – "the invention comprises an extended release formulation of", "[t]he formulations of

this invention comprise" and "[t]he extended formulations of this invention are" – rebuts the

presumption established by the doctrine of claim differentiation.  *See, e.g.*, *Kraft Foods, Inc. v.*

*Int'l Trading Co.*, 203 F.3d 1362, 1368-69 (Fed. Cir. 2000) (finding the presumption of claim

differentiation overcome because the specification and prosecution history described the

"protecting back panel" as one that must be relatively stiff).  Although this may make certain

11

dependent claims coterminous and certain claim limitations superfluous, that result is inevitable and inescapable in a case such as this where the patentees act as their own lexicographers. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence."); *Sule v. Kloehn Co., Ltd.*, 149 F. Supp. 2d 115, 128 (D.N.J. 2001) ("Claim differentiation is a guide, not a rigid rule.  If a claim will bear only one interpretation, similarity will have to be tolerated.") (quoting *Autogiro*, 384 F.2d at 404) .

The portions of the prosecution history in evidence do not alter this conclusion.  Although Wyeth contends that the prosecution history supports a broader construction because the method claims were allowed without limitation to specific ingredients, given the clear and unambiguous language in the specification, the Court believes that the prosecution adds, at most, nothing more than the claims themselves reveal.  That being the case, the definition provided by the specification, which is the "single best guide to the meaning of a disputed term," shall be adopted.  *Vitronics*, 90 F.3d at 1582.

Because the meaning of the term can be ascertained from the intrinsic record, the Court will not rely on extrinsic evidence that suggests a broader construction.  *See Phillips*, 415 F.3d at 1324 (prohibiting the use of extrinsic evidence to contradict the unambiguous meaning provided to a claim term by the intrinsic evidence).  That evidence takes the term out of its all-important context in the specification and, thus, will be given no weight.

In sum, "extended release formulation" means "a formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl

cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration."

###    2.        "spheroid"

Wyeth contends that "spheroid" means "[o]ne or more particles that are generally shaped like a sphere, although they do not have to be perfectly round", including "granules, beads and pellets." (Chart).  Teva asserts that "spheroid" means "[o]ne or more particles that are generally shaped like a sphere and result from an extrusion and spheronization process." (*Id.*, emphasis added).  Essentially, although the parties agree that "spheroid" means "one or more particles that are generally shaped like a sphere," they dispute whether the term should be limited to a particular manufacturing process.  Because the intrinsic evidence does not narrow the meaning of "spheroids," which connotes shape, the Court will not limit its construction to a specific manufacturing process.

The term "spheroid" is contained in asserted claims 13 and 14 of the '120 patent.  Wyeth argues that these claims are drawn broadly to include any "spheroid," regardless of the method of manufacture.  Claim 13 recites:  "The method of claim 1 wherein the extended release formulation comprising venlafaxine hydrochloride in a spheroid." '120 patent, claim 13 (emphasis added).  Claim 14 is similarly broad: "The method of claim 1 wherein the extended release formulation comprises venlafaxine hydrochloride in an encapsulated spheroid." '120 patent, claim 14 (emphasis added).  Thus, the plain language of the claims does not suggest that the term "spheroid" has anything other than its ordinary meaning.  Morever, the specification

uses the ordinary meaning of "spheroid," equating "beads" with "spheroids" without any apparent limitation on the method of manufacture. *See* '171 patent, col. 4, lines 12-13 ("Formed as beads or spheroids, the drug containing formulation is coated . . . ."). This ordinary, unrestricted meaning is consistent with how "spheroid" is defined in a dictionary – "[a] body that is shaped like a sphere but is not perfectly round, esp. an ellipsoid that is generated by revolving an ellipse around one of its axes." Am. Heritage College Dict. 1310 (3d ed. 1993).

Teva does not dispute that Wyeth's construction comports with the ordinary meaning of the word "spheroid." (*See* Teva's Opp'n Br. at 23). Rather, it contends that in this case the patents do not support the broader definition because they only identify one method of manufacture – the extrusion and spheronization process. For example, in the "Background of the Invention," the patentees described the process they used for making "spheroids:"

> In this situation, the extended release capsule dosage forms may be formulated by mixing the drug with one or more binding agents to form a uniform mixture which is then moistened with water or a solvent such as ethanol to form an extrudable plastic mass from which small diameter, typically 1 mm, cylinders of drug/matrix are extruded, broken into appropriate lengths and transformed into spheroids using standard spheronization equipment. The spheroids, after drying, may then be film-coated to retard dissolution.

'171 patent, col. 1, lines 38-47 (emphasis added); *see also* col. 5, lines 1-13 (stating that the addition of microcrystalline cellulose and HPMC made manufacture of spheroids with extruders possible); col. 6, lines 6-11 (stating that different extruders allowed spheroids to be made without HPMC).

Teva overreaches. Although the patents disclose only one method of manufacturing "spheroids" – the extrusion and spheronization process – it appears to be described as a preferred

method of manufacture, not the only method of manufacture.  *See* '171 patent, col. 1, lines 38-47

(stating that the extended release formulations "may be formulated by" extrusion and

spheronization, not must be formulated by this method).  Teva appears to be attempting to import

the preferred process into the claims.  But there is no clear disclaimer of the term's ordinary

meaning, nor do the patentees define "spheroid" as being limited to that method of manufacture.

Further, the Federal Circuit has held that merely disclosing only one method of manufacture in

the specification does not, by itself, limit the term to that one method.  *See Vanguard Products

Corp. v. Parker Hannifan Corp.*, 234 F.3d 1370, 1371-72 (Fed. Cir. 2000) (construing the word

"integral" to define the relationship between layers in a gasket, and refusing to limit the

formation of those layers by co-extrusion, the only manufacturing process disclosed in the

specification and extolled in the prosecution history); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*,

375 F.3d 1367, 1373 (Fed. Cir. 2004).

Teva raises one additional argument to support its narrow construction.  It alleges that

because the patentees neither described nor enabled the making of "spheroids" by any method

other than by extrusion and spheronization, the term "spheroid" should be limited to maintain the

validity of claims 13 and 14.  (Teva's Br. at 28).  Teva notes that the named inventors were aware

of other methods of making "spheroids," but did not disclose them to the public.  Absent that

disclosure, Teva contends that the claims are not enabled or described.  This argument is flawed.

A court should not construe a claim term to preserve a claim's validity unless, "after applying all

the available tools of claim construction," the claim term remains ambiguous.  *Liebel-Flarsheim*,

358 F.3d at 911.  Here, the term "spheroid" is not ambiguous and, therefore, the Court will not

embark on a validity analysis at this time.

In conclusion, the Court finds that "spheroids" should not be limited to a particular method of manufacture.  As such, the Court finds that "spheroids" means "one or more particles that are generally shaped like a sphere, although they do not have to be perfectly round."

### 3.     "with diminished incidence(s) of nausea and emesis"

The parties agree that the meaning of the term "incidence" should include "frequency" of an occurrence or event.  (Chart).  They disagree, however, whether it should include "degree" or "level."  (*See id.*).

The claims that contain this limitation are unilluminating.  *See, e.g.*, '171 patent, claims 20, 22-23.  Therefore, the Court begins by looking at the specification.  Both parties refer to the same passage in the specification to support their construction:

> The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the <u>level</u> of nausea and <u>incidence</u> of emesis that attend the administration of multiple daily dosing.  In clincial trials of venlafaxine hydrochloride ER, the probability of developing nausea in the course of the trials was greatly reduced after the first week.  Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies.  Thus, in accordance with this use aspect of the invention there is provided a method for reducing the <u>level</u> of nausea and <u>incidence</u> of emesis attending the administration of venlafaxine hydrochloride which comprises dosing a patient in need of treatment with venlafaxine hydrochloride with an extended release formulation of venlafaxine hydrochloride once a day in a therapeutically effective amount.

'171 patent, col. 2, lines 45-62 (emphasis added).

Both parties agree that the reference to "level," as used in the above passage, connotes degree.  They disagree, however, on what affect, if any, that has on the meaning of "incidence."

Teva contends that the passage above distinguishes between "level," i.e., degree, and "incidence," i.e., frequency.  Teva further points out that the claims do not use level or degree; rather, they only refer to "incidence."  Wyeth contends that the passage equates "incidence" with "level," thereby broadening the meaning of the term to include degree.  Wyeth also juxtaposes the above passage with an excerpt that appears earlier in the specification:

> With the plural daily dosing regimen, the most common side effect is nausea, <u>experienced by</u> about forty five percent of patients under treatment with venlafaxine hydrochloride.  Vomiting also <u>occurs in</u> about seventeen percent of the patients.

'171 patent, col. 2, lines 7-11 (emphasis added).  Wyeth asserts that this passage demonstrates that when the patentees meant to refer to the number of patients experiencing a side effect, they did so by stating that they were "experienced by" or "occurs in" a certain "percent" of patients.  Significantly, according to Wyeth, the patentees did not equate percent with "incidence."  Thus, Wyeth asserts "incidence" is broader than frequency.

Wyeth's argument is inapt.  Simply because the patentees did not use the word "incidence" in the earlier passage does not by itself redefine "incidence."  Rather, that passage makes clear that the patentees were concerned with the number of patients experiencing side effects, not necessarily the severity of those side effects.  Moreover, the abstract states that the invention "provides a lower <u>incidence</u> of nausea and vomiting <u>than the conventional tablets</u>." '171 patent, Abstract (emphasis added).  Because the only discussion of the conventional tablets in the specification that is relevant to the term "incidence" concerns the percent of patients that experienced side effects, the abstract supports a narrow construction.

17

Ultimately, Teva appears to be correct that the patentees drew a distinction between "level" and "incidence."  Although the specification refers to both terms, the claims only recite "incidence."  If indeed "incidence" meant the same thing as "level," or was broader, it begs the question why the word "level" was used in the first place.  The reason must be because the patentees meant to differentiate between the two terms.  It is clear from the specification that when the patentees wanted to refer to "incidence," they did.  Thus, the term "incidence" will be limited to its ordinary meaning as informed by the specification.

Lastly, it is worth noting that "[t]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives."  *Liebel-Flarsheim*, 358 F.3d at 908.  Thus, the fact that the patents may discuss a reduced "level" and "incidence" of nausea does not require that claims using the word "incidence" encompass both benefits.  In addition, the "incidence" limitation is not present in all of the asserted claims.  *See, e.g.*, '171 patent, claims 21, 24-25; '958 patent, claims 2, 5-6.  Therefore, to the extent that Wyeth suggests that a narrow construction of this term unjustifiably excludes one of the primary benefits of the invention, namely the reduction in degree of side effects, that is not the case for all asserted claims.  The asserted claims that do not contain the "incidence" limitation are obviously broader and would read on such benefits.

Furthermore, to the extent that Wyeth relies on extrinsic evidence to support its broad construction, the Court does not find that evidence particularly helpful.  The specification draws a clear distinction between "incidence" and "level."  General dictionary definitions that allegedly support a broader construction ignore the context within which the patents use the term.  *See,*

18

*e.g.*, Concise Oxford Dict. of Current English 614 (5th ed. 1964) (defining "incidence" as "range, scope, extent, of influence").  The Federal Circuit in *Phillips* warned of relying on such definitions:  "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  *Phillips*, 415 F.3d at 1321.  In any event, other dictionaries define the term as limited to frequency.  *See* Webster's Third New Int'l Dict. (Unabridged) 1142 (2002) (defining "incidence" as "rate, range, or amount of occurrence or influence . . . *sometimes*: the rate of occurrence of new cases of a particular disease in a population being studied") (emphasis in original); Taber's Cyclopedic Med. Dict. 1077 (19th ed. 2001) (defining "incidence" as "the frequency of new cases of a disease or condition in a specific population or group").  These dictionaries provide a common meaning that is more fitting given the distinction the specification draws between "incidence" and "level."

Wyeth's experts' opinions, which remove the term "incidence" from its proper context, are also given no weight.  *See Phillips*, 415 at 1318 (stating that a court "should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent'") (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).  Further, these experts' opinions are countered by Teva's experts, who opine that the common meaning of "incidence" is consistent with only frequency.  *See* Schoenfeld Expert Report ¶ 9; Morrow Expert Report ¶ 11.

Accordingly, the Court finds that "with diminished incidence(s) of nausea and emesis" means "a decrease in the number of patients suffering from nausea and vomiting compared to

patients receiving the same total daily dose of an immediate release formulation that is administered at least twice a day."

    **4.**    **"encapsulated"**

    Wyeth asserts that "encapsulated" means "[a] formulation that is present in a capsule, i.e., one that is filled into a pharmaceutically acceptable capsule." (Chart). Teva essentially proposes two different constructions depending on how the Court construes the term "extended release formulation." If the Court construes "extended release formulation" broadly to not include any particular ingredients, Teva contends that "encapsulated" means "[a] formulation that is present in a capsule." (*Id.*). On the other hand, if the Court construes "extended release formulation" to include particular ingredients, Teva agrees with Wyeth's narrower construction. (*See, e.g.*, Teva's Br. at 29 ("If the Court adopts Teva's construction of the term 'extended release formulation,' there is no dispute concerning the term "encapsulated."")).

    Although the Court disagrees with Teva's argument that the construction of the term "encapsulated" is contingent on the construction of "extended release formulation," there appears to be no need for this Court to perform an exhaustive analysis of how this term should be construed because the Court has adopted the narrower construction of "extended release formulation." That being the case, the parties do not dispute the meaning of the term "encapsulated." Accordingly, the Court finds that "encapsulated" means "a formulation that is filled into a pharmaceutically acceptable capsule."

**CONCLUSION**

For the aforementioned reasons, the Court construes the disputed claim terms as follows:

1.      "extended release formulation" means "a formulation comprising venlafaxine hydrochloride, microcrystalline cellulose and, optionally, HPMC coated with a mixture of ethyl cellulose and HPMC in an amount needed to provide a specific unit dosage administered once-a-day to provide a therapeutic blood plasma level of venlafaxine over the entire 24-hour period of administration;"

2.      "spheroids" means "one or more particles that are generally shaped like a sphere, although they do not have to be perfectly round;"

3.      "with diminished incidence(s) of nausea and emesis" means "a decrease in the number of patients suffering from nausea and vomiting compared to patients receiving the same total daily dose of an immediate release formulation that is administered at least twice a day;"

4.      "encapsulated" means "a formulation that is filled into a pharmaceutically acceptable capsule."

**Dated:**  September 6, 2005                                         s/ William J. Martini
                                                                                **William J. Martini, U.S.D.J.**